## WELCH *v.* MICHIGAN CENTRAL RAILROAD CO.

RAILROADS—CROSSING ACCIDENT—SPEED ORDINANCE — VIOLATION —CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

Plaintiff's intestate and another attempted to cross railroad yards at a point where there were 20 or more tracks more or less filled with cars and used for switching, when they were stopped by a freight train passing on the second from the last track they had to cross. Immediately on the passing of the freight they attempted to cross the remaining tracks, drove in front of a passenger train approaching at the rate of 50 miles an hour in violation of an ordinance limiting the speed of trains to 6 miles an hour, and were killed. Evidence that they were warned of the approach of the train was not conclusive. The passenger train whistled when a mile from the crossing as the last car of the freight train passed the crossing. *Held*, that, in view of the many sources of danger, and the comparatively short distance to a place of safety, they were not, as a matter of law, guilty of contributory negligence, and that the question was properly submitted to the jury. GRANT, J., dissenting.

Error to Kent; Wolcott, J. Submitted June 19, 1906. (Docket No. 51.) Decided March 5, 1907.

Case by J. Darius Welch, administrator of the estate

of William O. Sherman, deceased, against the Michigan, Central Railroad Company for the negligent killing of plaintiff's intestate. There was judgment for plaintiff, and defendant brings error. Affirmed.

*Taggart, Denison & Wilson* (*Henry Russel* and O. *E. Butterfield,* of counsel), for appellant.

*Morse & Locke* and *Carroll & Nichols,* for appellee.

GRANT, J. On the night of November 11, 1904, about 6:45 o'clock, the deceased was struck by an engine, while crossing defendant's track, and killed. The acts of negligence charged are the customary ones of failure to blow the whistle, to provide gates, or a person to give warning at the dangerous crossing, and undue speed. The situation, the tracks, the obstruction to sight by standing cars, the darkness of the night, the confusing noise of another train crossing the track just before the accident, and other circumstances making it difficult to see and hear, are set forth in the declaration. There is no dispute about the material facts.

Hall street, in the city of Grand Rapids, runs east and west, and is about a mile and a half·south of the Union Station, and a mile north of Burton avenue, the city line on the south. There are a number of tracks crossing Hall street in the vicinity of the place where the accident occurred, two of which belong to the Michigan Central, and all the others to the Grand Rapids & Indiana Railroad Company. Starting from the east side, one comes first to a Michigan Central side track, and then to the Michigan Central main track, which is perfectly straight to Burton avenue, a distance of a mile. Next west, and 8½ feet from the latter track, is the Grand Rapids & Indiana main track; 7½ feet west of that is the Grand Rapids & Indiana switch track No. 1, and 8½ feet west of that is Grand Rapids & Indiana switch track No. 2, and west of that are seven more tracks, each 8½ feet from each other. Then comes a space of 60½ feet, and west of

that are eight more Grand Rapids & Indiana side tracks. All of these tracks are parallel to each other, and nearly at right angles to Hall street. They bear 16 degrees west as one goes south.

The declaration alleges that these "parallel tracks of said defendant and other companies were stored with freight trains." Counsel for plaintiff, in their original brief, state that:

"On nearly every one of these switch tracks, cars were stored or standing."

Counsel for defendant, in their original brief, state:

"The Grand Rapids & Indiana side tracks, at least those nearest the main track, were at the time of the accident filled with standing freight cars, which came close to the south side of Hall street, so that they obstructed the view of the south of one coming from the west."

This statement was not disputed upon the first hearing. Upon the second hearing (ordered by this court), counsel for plaintiff claim that the record does not show that cars were standing on track No. 2, or the second track from that of the passing freight train on the main line.

The testimony as to the standing cars is as follows: One Griffin, a witness for plaintiff and yard conductor of the Grand Rapids & Indiana Railroad Company, stood on No. 4 track south of Hall street at the time of the accident. He testified:

"There were cars on most all of the tracks. The yard was pretty full of cars on both sides of the street."

One Ellsworth, a witness for plaintiff, who stood near by at the time of the accident, testified:

"Every switch track south of Hall street was full of cars. There were cars on track 1, the next track to the Grand Rapids & Indiana main track, and cars were stored on all of those switch tracks west of track 1, or nearly all. It was just the same on the north side."

One Wilschefski, a witness for the plaintiff, testified:

" *Q.* Along Hall street there, do you know as to whether or not the switch track to the west of the Grand Rapids & Indiana main track was filled or not ?

"*A.* They were not.

" *Q.* The next track west from the main track, as to whether there were box cars on that track or not ?

"*A.* Yes, sir; there were box cars on that track."

One Arnold, a witness for plaintiff, testified:

" At the time of the accident, there were cars on the tracks north of Hall street."

The above is all the testimony as to the location of the freight cars upon the side tracks.

A switch engine was about 800 feet to the southwest in the yard. It was on the fourth track from the main line of the Grand Rapid & Indiana Railroad. It was standing still at the time, but making some noise. Another switch engine was at work in the yard about the same distance to the northwest. One Tangenberg was driving a team of horses on a covered delivery wagon, and Sherman was riding with him. Tangenberg was familiar with the crossing, for he had been driving delivery wagon on this route for about two years. The horses were under control. Wilschefski testified that the off horse was uneasy, and the driver " was talking to his horse, ' Whoa, boy,' as anybody talks to a horse." They were coming from the west on Hall street at 6:45 p. m. It was dark. There was an electric light burning which stood on the north side of Hall street, about 70 feet east of the Michigan Central main track. There was also an electric light west of the Michigan Central track, near the south side of Hall street, about 130 feet west of the Michigan Central main track. Sherman and Tangenberg drove over the Grand Rapids & Indiana side tracks, but found a freight train on the Grand Rapids & Indiana main track moving slowly to the south. The horses' heads were from 4 to 8 feet from the moving train, or, as stated by the appellee, about 22 feet west of the Michigan Central's west rail, which would place Sherman and Tangenberg from

38 to 40 feet west of the track. As the Grand Rapids & Indiana freight train was crossing Hall street, a Michigan Central passenger train, running from 25 to 50 miles per hour, came in sight from the south. The headlight was burning brightly, and a bell was ringing automatically. The whistle was blown for the Burton avenue crossing (one mile south of Hall street), then a long station whistle and afterwards the whistle was blown for Hall street, about 80 rods before coming to the crossing. This is the testimony of the fireman (the engineer had died before the trial), and is not disputed, although several witnesses do not know whether the whistle was blown or not. No street between Burton avenue and Hall street crosses the tracks.

Plaintiff's witness Ellsworth was walking west on Hall street, and was also stopped by the Grand Rapids & Indiana freight train. He heard the Michigan Central train coming before it reached South Grand Rapids, which is just south of Burton avenue, and more than a mile from Hall street. His view of the train was obstructed by the Grand Rapids Fancy Furniture Company factory. Plaintiff's witness Wilschefski was a brakeman on the rear end of the Grand Rapids & Indiana freight train. He heard the Michigan Central whistle for South Grand Rapids. He saw the train at the same time from the top of a car. Griffin, another witness of plaintiff, is a Grand Rapids & Indiana yard conductor, and was with his engine just south of Hall street when the accident happened. He heard the Michigan Central train coming, and heard it whistle for the station about half a mile before reaching Hall street. Geary and Sisson, two of defendant's witnesses, were going west on Hall street, and were also stopped by the Grand Rapids & Indiana freight train. They stopped on the Michigan Central main track, and saw the Michigan Central train coming, and heard it whistle, when it was about at Burton avenue. Looking between or over the cars of the moving freight train, Geary saw Sherman and Tangenberg waiting to

cross, and, thinking that the freight train would pull over the crossing about the time the Michigan Central train reached Hall street, they realized that the team might get struck as it crossed the Michigan Central track. Geary determined to warn the men of their danger, and, walking a little to the south of Hall street, he climbed through the slowly moving freight train, going on the end sills between the cars, and got down on the west side of the freight train on the south side of Hall street. Geary stepped up to the driver's (south) side of the wagon and told Tangenberg, who was driving, that the Michigan Central was coming, and that he thought it would reach the crossing about the time that the freight train pulled by. One of the men in the wagon said: "Where is it?" Geary replied that the train was coming on the track next to the moving cars. Sisson was on the north side of Hall street, and crossed the Grand Rapids & Indiana main track as soon as the freight train got over this sidewalk. He saw the team start up. He "yelled" at the men in the wagon, but heard no reply. Wilschefski, the brakeman on the rear end of the freight train, testified at the coroner's inquest, three or four days after the accident. He then swore that as he passed over Hall street he was "on the end of the car, right below, on the step." On the trial, about a year later, he testified that he was on the top of the rear car as it crossed Hall street. But, in whichever position he was, as he passed Sherman and Tangenberg, he called to them: "For God's sake, boys, look out for the Michigan Central! She is right here." One of the men answered, but the witness does not know what he said. It sounded like, "To hell with the Central," but he is not sure that this was the reply.

All the four witnesses, Ellsworth, Wilschefski, Geary, and Sisson, who saw the accident, say that Sherman and Tangenberg started up just as soon as the freight train passed the horses' heads. Ellsworth testified:

"When I first saw them, they had just started up there. Just the moment the train passed off, their horses started.

The first I saw of them was as the cars passed out of the
way, and, at that same instant, they were in motion, start-
ing.   Their horses were on a jog of a trot.   The young
man was urging them.   I don't remember of his having
any whip, but he was urging them in some way with the
lines—he was jerking them.   I remember that they started
up on a trot.   They started on that trot and came right on
to this track and were struck.   It was all in an instant
from the time I saw it."

Wilschefski says:

"They drove right in behind us so close I thought they
were going to take our drawbar off.   They drove as if
they were late, and were in a hurry to get home.   I
thought they would hit our drawbar with their wheels.
They were pretty close to the hind end.   I hollered: 'Look
out for the Michigan Central passenger!'"

In a written statement which he signed the day after
the accident, Wilschefski says that, as the train pulled by,
the driver "whipped up his horses, and they started at a
good gait;" but on the trial the witness did not remember
"about his whipping his horses."   Sisson says Tangen-
berg and Sherman "started up just as soon as the train
pulled by," and, in less time than it takes to tell it, they
were struck by the train.

The two men made some attempt to "look" after they
started.   Ellsworth says that Tangenberg—

"Had his head hanging out of this wagon, evidently
looking back after the switch engine that was working
over to the south and west of him.   *   *   *   They were
looking back all the time until their horses got right onto
this Michigan Central track.   *   *   *   The man that sat
on the north side of the wagon was looking out at the
north toward the engine over there.

"Q. The man who was on the south side had his head
turned back partly away from the Michigan Central train
as it was coming towards him?

"A. Yes, sir; from the way he was looking back of
his wagon, back over in this direction that this switch
engine was then.   *   *   *   He didn't turn from looking
in that position until he got right onto the Michigan Cen-
tral track.   Then he turned his head and raised up.   Evi-

dently it was his intention to jump. It was when he was right on the track that he first turned his head south, at all, I think. The man on the north (Sherman) was looking in that direction until he got— He raised up first, that is, straightened up, and was looking east before the man that was doing the driving. * * * He didn't look south as I remember. I didn't see him look in that direction at all."

Wilschefski's testimony is substantially the same on this point. He says that, when he "hollered" at the men, "one of the men kind of stuck out his head and looked back and looked forward and kept looking forward. That was the man on the south side. He looked back and looked west, and then he looked ahead, and this other man did the same thing."

The engineer did not see the rig until the horses were on the track. He put on the emergency brake hard, and the horses got over, but the wagon was struck, and both Sherman and Tangenberg were instantly killed.

The sole question for our consideration is: Were the deceased guilty of contributory negligence? All other questions are waived by the defendant. In view of the argument of the distinguished counsel for the plaintiff, we may well refer to a few well-established rules or principles of law:

1. It is not only the province but the duty of the trial judge to determine, as a preliminary question of law, whether there is any evidence upon which a jury may properly find a verdict against the defendant. *Carver* v. *Plank Road Co.*, 61 Mich. 584, and the many authorities there cited; *Mynning* v. *Railroad Co.*, 64 Mich. 93. It is equally the duty of the appellate court to pass upon the same question. Different courts have not agreed upon similar facts. Neither have appellate courts been unanimous in their opinions upon the question of law which such cases have presented. Every justice who has sat upon this bench has both written and signed opinions reversing cases where a jury has found that the plaintiff was not guilty of contributory negligence, or that a de-

fendant was negligent. Cases have been affirmed, and other cases reversed, where the trial judge has performed his duty and ruled upon the question. *Tucker* v. *Railway Co.*, 122 Mich. 149; *Boutell* v. *Railroad Co.*, 133 Mich. 486; *Lau* v. *Railway Co.*, 120 Mich. 115; *Stewart* v. *Railroad Co.*, 119 Mich. 91; *McGee* v. *Railway Co.*, 102 Mich. 107 (26 L. R. A. 300); *Jensen* v. *Railroad Co.*, 102 Mich. 176; *Gardner* v. *Railroad Co.*, 97 Mich. 240; *Shufelt* v. *Railroad Co.*, 96 Mich. 327; *Phillips* v. *Railway Co.*, 111 Mich. 274; *Jakoboski* v. *Railroad Co.*, 106 Mich. 440. We said in the last case that "it is impossible to conceive upon what a jury could base a verdict in favor of the plaintiff," and reversed the case. These citations might be multiplied, but the above are sufficient. Trial courts and appellate courts have and will continue, probably, to differ on this as they have and do on other questions of law.

2. Where the evidence is conflicting, or where different conclusions may be reasonably drawn from established or conceded facts, the question belongs to the jury.

3. The general rules of law governing the degree of care and diligence are not in dispute. They are well understood. The difficulty lies in applying the rule to the differing facts of each case. The degree of diligence to be exercised varies with the dangers imminent. So, what one must do before crossing a railroad track, where and when he must stop and look and listen, must be determined from the facts of each case, and neither trial nor appellate courts can avoid the determination of the question.

4. A railroad track is always a warning of great danger. When one approaches it, whether on foot or on horseback, or in a carriage, it is his duty to look and listen when and where such looking and listening will convey to him the information necessary to avoid accident. A train of cars cannot stop. He can. If stopping, looking, and listening will be of any avail for his protection, as well as those upon the train, he must avail himself of such oppor-

tunity, before entering into a place where death is imminent, at that point and distance from the track at which it is practicable for him to do so, whether that distance be 50, 25, 10, or 5 feet from the track. The fact that a train is past due affords no excuse for the failure to look and listen at the proper time and place. Trains are often late, and may cross a highway or street at any moment. *Tucker* v. *Railway Co.*, 122 Mich. 149; *Elliott* v. *Railway Co.*, 150 U. S. 245; *Chicago, etc., R. Co.* v. *Smith*, 141 Fed. 930.

Where the view of a bicyclist is obstructed by cars standing upon two or three tracks next to the main line, he is required to dismount, if necessary, to look and listen. *Lau* v. *Railway Co.*, 120 Mich. 115.

In *Gardner* v. *Railroad Co.*, 97 Mich. 240, a pedestrian was held guilty of contributory negligence for failure to look when within five feet of the track.

In the light of these principles the question of contributory negligence must be determined.

The undisputed facts in this case are as follows: Tangenberg, the driver, whose negligence is imputable to the deceased, Sherman, was entirely familiar with the situation, the surroundings, and danger. He had driven over this street daily for two years. He was familiar with the railroad yard, with all the tracks and the storage, and the passing and making up of trains. He must have learned during that time which was the main track of the Grand Rapids & Indiana and of the Michigan Central. He stopped his team so that his horses' heads were about 22 feet from the Michigan Central main track, onto which he drove to his death. The horses stood with their heads from 4 to 6 feet from the passing freight train on the Grand Rapids & Indiana on the next track, No. 1, and partly in the space between tracks Nos. 1 and 2, with the rear end of the wagon standing on track No. 2. Both of these tracks on the north side of the street were occupied by standing freight cars. The track next to the moving train upon the south was also so occupied. Whether there

were cars standing on track No. 2 to the south is, in my opinion, immaterial in determining the question of negligence. The noise made by the moving train and the two engines in other parts of the yard may justify the inference that the deceased did not hear the whistle or bell, or any noise made by the defendant's train, though his witnesses did hear it. Wilschefski, Sisson, and Geary were in position to, and did, see it. The deceased did not wait for the freight train to pass far enough to bring the incoming train of the Michigan Central within their vision, but drove immediately across. Had they stood still but a second or two, or if they had approached the Michigan Central track upon a slow walk, and had looked, the accident would have been avoided. It was clearly their duty to do so, unless danger threatened them from the tracks upon which their horses and wagon stood, or they had reason to believe that danger so threatened, and drove on in order to escape it. If a pedestrian is bound to look when approaching and is within a few feet of a railroad track, for the same reason a traveler passing with a horse and vehicle is bound to take the same caution, if he has the opportunity to do so. His duty to do so is the greater, because in driving upon the track he not only endangers his own life and property, but the lives and property of others.

Counsel for the plaintiff seek to excuse the action of the deceased by insisting that they were suddenly situated in a place where danger threatened them from all sides, that they acted in view of the circumstances as they appeared to them, and that they had the right to so act. They were in a place of absolute safety, and, unless they had a right to believe that the standing cars would be backed down upon them without any warning, and, if track No. 2 was empty on the south, that a train was liable to come down upon them upon that track, their action was negligent. They could look along track No. 2 for a long distance and see an engine approaching, if it was approaching head on, with the light burning. No train was ap-

proaching upon the track. It cannot reasonably be inferred, in my opinion, that the apprehended danger was approaching upon track No. 2. There is no evidence that on this much used street cars had ever been backed across it, or that a switch engine had ever crossed it, without some one warning those passing over the highway. In the absence of such evidence, no one has a right to presume or fear that such a negligent act will be committed, and rush into a place where every one knows that danger of death is imminent. To hold that the deceased had the right to believe that they were exposed to danger on these two tracks would be to hold that they had the right to assume that the railroad employés would be guilty of inexcusable negligence. *Davis* v. *Railroad Co.*, 142 Mich. 382.

Furthermore, Tangenberg must have known that tracks Nos. 1 and 2 were a part of the storage and switch yard of the railroad companies. Aside from his knowledge, acquired by two years of daily travel over the street, the fact that freight cars were standing on all these tracks, including Nos. 1 and 2, with their ends near the sides of the street, would have notified any one familiar with such places that he was in a railroad yard. He must have known that a train could not come on track No. 2 without crashing into the cars standing on that track north of the highway. He had no right to assume that such a careless and unusual act would be committed. His acts must be construed in the light of what men of ordinary prudence do, and not what the most careless of men might do. That the deceased did not anticipate any danger in the movement or passing of trains across the highway upon the two tracks on which their horses and wagon stood, while the freight train was passing, is clearly shown by the fact that they did not look either way while standing there. They did not look until the freight train had passed and they were hurrying their horses to get across. There were no noises in the yard with which Tangenberg was not familiar. There was no sign of any unusual

movement of cars. I can find nothing to justify the conclusion that he had any right to suppose that the cars stored in the yard would be backed down upon him without warning. I think it was the clear duty of the deceased to stand where they were for two or three seconds, until the freight train had passed out of their line of vision, so they could see down' the Michigan Central track, or to approach this track upon a slow walk, with their horses under control. Either course would have avoided the accident. It was 22 feet from the horses' heads to the track, a distance ample to walk their team, and look and listen. In moving 5 or 6 feet they were off track No. 2. It was said by Mr. Justice MORSE, in *Thomas* v. *Railway Co.*, 86 Mich. 496, that a party driving across a railroad track is bound—

"To have his team in such a state, as to driving, that he could stop them at once, if necessary. He should have brought his team down to a walk before crossing, for the purpose of having a better opportunity to look and listen, and also to be in a condition to stop them at once if the train was found to be approaching."

The jury, in response to a special question, found that:

"A reasonably prudent and careful driver, approaching the Michigan Central track, under the circumstances of this case, when the driver was within 18 or 20 feet from the track, and while his team was under such control that he could still stop, should have looked down the Michigan Central track to the south, before driving thereon."

There is evidence from which it may be inferred that the deceased looked as they rapidly drove along. But the circumstances in which they were placed required greater care than this on their part. Their conduct in driving as they did was not an act of common prudence.

The citation and analysis of analogous cases will perhaps afford little light. We think, however, that this case is within the principle of the cases above cited. Where a plaintiff stopped his team 12 feet from the track,

after passing a building which obstructed his view, and looked and listened, it was held that he was not, as a matter of law, guilty of contributory negligence, where an engine on a side track was blowing off steam and smoke which covered the ground and obstructed his view.  *Mc-Duffie* v. *Railway Co.*, 98 Mich. 356.  Had the deceased in this case stopped when 12 feet from the railroad track to look and listen, they would have avoided the accident. Where parties about to cross a railroad track cannot hear for the surrounding noises, it is their duty to take greater care to look.  If the noise which prevents the hearing is a passing train directly in front of them, it is their duty to wait until that train has passed sufficiently out of hearing to afford an opportunity to hear and determine whether a train is approaching upon a contiguous track. So, also, if the passing train obstructs their view, it is their duty to wait until it has gone far enough to afford them a view.

2. Were the deceased warned of the approach of the Michigan Central train?  The answer to this question depends entirely upon whether their action after such notification justified the inference that they did not hear it, or, if they heard, did not understand it.  Passing the testimony of Wilschefski, Ellsworth, and Sisson, who were at some distance, and all testified that they shouted out warnings, we take up the testimony of Geary.  He was disinterested.  He and Sisson, with whom he was standing on the opposite side of the moving freight train, saw the danger, and feared that the deceased might drive upon the Michigan Central track as soon as the freight had passed over the street.  Prompted by the ordinary dictates of humanity, Mr. Geary, an experienced railroad man, climbed upon the train, passed through it, jumped off upon the opposite side, walked up to the vehicle, stood but 3 to 4 feet from the deceased, and told them that the Michigan Central train was coming; that one of the deceased asked, "Where is it?" and he told them upon the track next to the moving train.  If this testimony is to be

believed, actual notice of the approach of the train and of the danger was given. Geary's testimony is true, or else he committed perjury. The sole evidence upon which such charge can be based is that the deceased drove rapidly upon the track without taking the steps that common prudence would have required to ascertain whether the information was correct. The true rule, as has several times been stated by this court, is that:

" If there is anything tending to create distrust in his [the witness'] truthfulness, the question must be left to the jury." *Michigan Pipe Co.* v. *Insurance Co.*, 92 Mich. 482, 488 (20 L. R. A. 277).

The deceased were 14 feet from the slowly moving train. The only other noises were those made by a switch engine in operation about 700 feet to the northwest, and another switch engine, standing still, about 800 feet to the southwest. Manifestly the deceased could hear when Geary was so near. If Geary is worthy of belief, they did hear and understood. That he climbed over the freight train for that purpose is corroborated by the disinterested witness Sisson. Where two employés testified that they notified a deceased of the danger in doing just what he did do, and in consequence thereof was killed, the trial judge directed a verdict for the defendant upon the ground that these two employés told the truth, and his direction was affirmed by this court. *Cron* v. *Railway*, 132 Mich. 497. We there called attention to the distinction between *Prueschoff* v. *Brewing Co.*, 132 Mich. 107. See, also, the authorities cited in the *Cron Case.* I think it conclusively established that the warning was given and was understood, and that the deceased rashly took the chance, which many have so often taken, that they could get across before the train came.

The judgment should be reversed, and new trial ordered.

OSTRANDER, J. The facts of the case are very fully and well stated in the opinion of Mr. Justice GRANT.

There should be added, for the purpose of a better understanding of the surroundings of the men while they were waiting for the freight train to move out of their way, the following testimony, given by the yard conductor of the Grand Rapids & Indiana Railroad Company:

"When we are working down there, we are moving cars nearly all the time. They are moving cars the larger part of the 24 hours. There are engines and trains passing over Hall street nearly all the while, I should say, either on one track or the other. A person crossing that street would have to look for cars from each way. We are shoving cars back over the street, and pulling them south of the street, all the while—backing up and going forward."

This testimony relates to the two railroad tracks upon which the horses and wagon were standing. The assumption that the driver knew the surroundings must be extended to knowledge of the facts just stated, and, added to the fact that two switch engines were, at the time, working among the cars, upon some of the tracks, one engine to the north and the other to the south of Hall street, presents a group of facts of considerable significance. It may be admitted that, if cars had been, without warning, backed down upon these men, they or their representatives could have recovered damages for injuries thereby received (*Davis* v. *Railroad Co.*, 142 Mich. 382; *Grand Rapids, etc., R. Co.* v. *Martin*, 41 Mich. 667), and still it does not follow, and the cases cited illustrate the fact, that a man is safe in occupying a position because it is one in which he has the legal right to be safe. Ahead of them was another track, upon which a freight train was moving. After the freight train passed, another might follow it on the same track. Further on was the track on which they were killed. The nervous horse received some attention. It is not the case of one attempting to pass over a single railroad track, from absolute safety on one side to equal safety on the other side. It is only by assuming that the men ought to have assumed they were in a place of no danger, and the only place of

danger was in crossing defendant's tracks, that we are warranted in reaching the conclusion arrived at by Mr. Justice GRANT in the fourth subdivision of his opinion. Such an assumption directs their and our attention entirely to a single place of possible danger, and leaves out of sight the reasonable apprehension which may have attended them over the entire distance, exercising their faculties at the same moment in many directions. While it is not the case of one threatened with imminent danger who chooses one of several ways which seem to lead to safety, it is a case of crossing, consecutively, railroad tracks, lying so near to each other that human experience and natural apprehension, if not prudence, would cause, if it did not require, each of them and from both sides to be watched for possible danger.

The post-mortem knowledge that, if there had been a slight delay in moving upon the track, there would have been no injury, does not aid, in this case, in the determination of rights. The ordinance of Grand Rapids requires trains to be run at a speed not exceeding six miles an hour. Obedience to this law would have averted the injury.

The evidence that the injured men were warned of the approach of defendant's train, and that they understood the warning which was given, is not conclusive. It is difficult to harmonize the testimony of Wilschefski, the brakeman on the moving Grand Rapids & Indiana train, and that of Geary and of Sisson upon this subject. Wilschefski says that the Grand Rapids & Indiana freight train had 15 or 16 cars, and came to a stop, blocking the Hall street crossing, because they could not get into the yard.

" When we approached Hall street crossing, the hind end of our cars stopped on the crossing, north of the crossing, and our engine stopped there to head in on the yard, to let them open the switch, and that other engine was working there."

The switch was 725 feet south of the south side of Hall street.

" We could not get in there, and we stayed there five minutes. * * * When our train came to a stop, our engine was right up to that switch with a head on in the yard; that is, from 14 to 16 cars, something like that, south of Hall street. The last car was just over north of Hall street. I first saw these people in the wagon just about as we started up. Just a little before we started, they drove up there and stopped. * * * I was down [on the ground] when I saw those people drive up there. Then I got back on the top again, for just as we started we just heard an engine bell start to ring. I knew it was a signal that they had to back in, and I got back on the car. When these people first drove up, I was on the ground. I don't recollect whether I said anything to them, because they just drove up there. After I climbed on top of the car, then I did say something to them. As we passed I hollered at them: ' Look out for the Michigan Central passenger!' There was smoke and dust around there and we could not see any headlights. * * * The first I heard the Central was after I got back on the car. * * * I did not hear the Michigan Central train before I got off the car, or while I was on the ground. Just as we started—just as we were going to start up—I heard the bell ring, and climbed back on top of the car, when they whistled for South Grand Rapids."

Wilschefski was on the rear end of the rear car of his train. The train, after standing for some minutes, had to move but a short distance to clear the road, and, he says:

" As we pulled by I heard the Michigan Central passenger train whistle for South Grand Rapids [a mile away], and knew they were coming, and as we pulled by I knew that they were pretty near up there; but, of course, I did not think they were as close as they really were. I hollered to this man to look out for the Michigan Central passenger train."

This testimony seems to be inconsistent with that given by Geary and by Sisson. Taking into account the evident speed with which the train was approaching, it seems to be also inconsistent with other facts related by the witness. The testimony of Geary may also have been found to be in itself inconsistent, since he did not suggest going to

warn the men until he had seen the passenger train at Burton avenue, after which he walked up the track, climbed over a moving train, on which he rode some 80 feet at a speed of from 4 to 6 miles an hour, alighted, had his conversation with the driver of the horses, passed to the north side of Hall street, and waited there for Sisson, who crossed after the moving freight train had passed him. The testimony strongly supports the idea that the passenger train, which was 25 minutes late, was traveling at a speed of 50 miles an hour, or more. Assuming that no more than 50 seconds elapsed after Geary saw the train until the men were struck, contrasting and comparing all of the testimony of the witnesses upon this subject, it should not be said that the special question ought, certainly, to have been answered in the affirmative. Assuming that the fact was, as Wilschefski states it, that as the rear car of his train went over the crossing at Hall street the passenger train whistled for South Grand Rapids, a mile away, and that the men in the wagon heard it, it would not follow, necessarily, that they showed a want of ordinary care in believing that by starting immediately, as he said they did, they could proceed in safety 40 feet while the train was going the greater distance, if they also, as the jury found they did, looked and listened.

The case is not free from difficulty. The single question presented is: Were these men, as matter of law, guilty of contributory negligence? Close as is the case upon the facts, it still presents ground for concluding that they were not so guilty. *Staal* v. *Railroad Co.*, 57 Mich. 239, 244, 245.

The judgment is affirmed.

McALVAY, C. J., and CARPENTER, BLAIR, MONTGOMERY, HOOKER, and MOORE, JJ., concurred with OSTRANDER, J.